Margaret B. MARTIN, individually, and as Executor of the Last Will of John C. Martin, deceased, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 2496.

United States District Court, E. D. Illinois.

Dec. 15, 1954.

Harold G. Baker and John M. Ferguson, Baker, Kagy & Wagner, East St. Louis, Ill., for plaintiff.

C. M. Raemer, U. S. Atty., for Eastern Dist. of Illinois, Salem, Ill., Benjamin H. Pester, Atty., Dept. of Justice, Washington, D. C., for defendant.

WHAM, Chief Judge.

The action herein was filed by the plaintiff, Margaret B. Martin, individually, and as executor of the last will of John C. Martin, deceased, for refund of income taxes and interest, pursuant to the provisions of Sec. 1346(a) (1) (ii) of Title 28 United States Code. The amount in dispute is $10,571.86, which said amount was paid by John C. Martin after a deficiency was assessed against him on his income tax return for the year 1948. The deficiency was assessed as a result of an interpretation by the defendant of certain business transactions, the income from which had been reported as "capital gain" in the said tax return, but which the defendant ruled to be "ordinary income" and thereby subject to a greater rate of taxation.

The business transactions in question concern certain tracts of real estate located in the State of California, which were purchased by John C. Martin. The first tract of real property involved was

578

purchased in 1935 and consisted of 11.96 acres located adjacent to property owned by Pacific Builders Incorporated (hereinafter referred to as Pacific) which was operated as "Sunnyside Mausoleum." Thereafter, negotiations were conducted between Mr. Martin and Pacific which resulted in a written agreement wherein Pacific was to develop the tract of land into a cemetery and to promote, advertise and sell individual cemetery lots and grave spaces to individuals. Title to the property was to remain in John C. Martin, and title to the individual cemetery lots would be conveyed from Martin to Pacific only when the lots had been sold to individual purchasers and Pacific had paid one-half of the purchase price to Martin. The responsibility for developing, sub-dividing, maintaining, operating, promoting and selling the lots was upon Pacific at its sole cost and Martin was to be held harmless. Pacific was under no obligation to purchase the property from Martin unless or until the lots were sold to individual purchasers, and Pacific had no title, or right to title, to the land occupied by service and maintenance facilities unless and until all cemetery lots had been sold to individual purchasers.

Over a period of years the tract of land was developed as a cemetery by Pacific and at the end of each quarter year Pacific forwarded a check to Martin in the amount of one-half of the sale price received from the completed sales made during the period along with deeds to the particular lots involved and Martin executed the deeds at Salem, Illinois and returned them to Pacific via a Mr. Decker, who was employed by Martin to make periodic checks of the books of Pacific.

In 1941 Martin purchased an additional tract of land containing 22 acres which was immediately adjoining the land purchased in 1935. Within a short period of time thereafter, on March 21, 1941, Martin again entered into a written contract with Pacific which contained covenants similar to those included in the earlier agreement. This 22 acre tract along with the 11.96 acre tract was

then developed by Pacific and payment was made to Martin and deeds executed by him on a quarterly basis as the cemetery lots were sold to individual purchasers by Pacific. Martin took no part in the development, advertising or selling of the cemetery lots nor did he direct or supervise any of these activities.

Mr. Martin was, during his lifetime, a resident of the State of Illinois and at no time did he or Mrs. Martin become residents of the State of California. He conducted his business as President of the Salem National Bank at Salem, Illinois and served in various capacities as an elected and appointed state and national governmental official. Mr. Martin owned shares of stock in the Long Beach Cemetery Association, a California corporation, and served as president of that association, and as such attended its annual meeting of shareholders and directors in California. On one of these trips to California he learned of the property involved in the first transaction here in question, and purchased said property. The Long Beach Cemetery Association had no connection with Pacific other than Mr. Martin's interest in the Long Beach Cemetery Association. Neither Mr. Martin nor Mrs. Martin ever owned any property in California except the two tracts of land involved in the present dispute. They had no stock or other interest in Pacific. Neither of them was ever licensed as a real estate broker either in California or Illinois, or ever participated in or exercised control over Pacific or its business or activities.

Federal Income Tax Returns were prepared and filed in Illinois and from 1936 the investments in the tracts of land in California were treated as capital assets on the said tax returns and the money received from Pacific was reported as "long-term capital gain", and the tax was computed and paid on that basis. When the 1948 tax return was audited by the Internal Revenue Department, Martin was advised that the money received from Pacific was not properly considered as "capital gain" and a deficiency was assessed against him, whereupon he

paid the deficiency assessment in the amount of $9,361.68 plus $1,210.18 in interest to the Collector of Internal Revenue.

A Claim for Refund was filed by Martin, which was denied, and all other administrative relief was exhausted and all conditions precedent to institution of legal action in this court were fulfilled. Thereafter, this action was commenced.

At the trial of this case there was no substantial conflict in the evidence with regard to the facts set out above. The conflict between the parties arose out of the interpretation to be given to the facts as outlined, particularly as to the effect of and the nature of the relationship between the parties to the aforementioned contracts.

The plaintiff takes the position that the sale of cemetery lots was a sale of a capital asset at the time of the transfer of title and that neither John C. Martin nor Margaret B. Martin were ever engaged in the trade or business of sub-dividing and selling cemetery lots and that the income received from the sale of said property should be considered as "capital gain" under the provisions of Section 117, Title 26 United States Code.[1]

The defendant contends that Martin was engaged in a joint venture with Pacific and was thereby in the business of sub-dividing and selling cemetery lots and that the income received from the sale of said property should be considered as ordinary income under Section 22, Title 26 United States Code.[2] In the alternative, defendant contends that if the court finds that this was a sale of a capital asset, it is a "short term capital gain" rather than a long term gain for the reason that Martin did not hold the 22 acres more than six months before he entered into the agreement with Pacific, and thereby sold the property to Pacific.

The issues presented for the determination of this court are: (1) Whether the profits received by John C. Martin from the sale of property to Pacific in the year 1948 are taxable as "capital gain" or as "ordinary income"? More spe-

---

1. "§ 117. Capital gains and losses

"(a) Definitions. As used in this chapter—

"(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23(l), or an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue, or real property used in the trade or business of the taxpayer; * * *.

"(b) Percentage taken into account. In the case of a taxpayer, other than a corporation, only the following percent-

ages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:

"100 per centum if the capital asset has been held for not more than 6 months;

"50 per centum if the capital asset has been held for more than 6 months."

2. "§ 22. Gross income

"(a) General definition. 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *"

cifically, was the property held by the taxpayer a capital asset and an investment, or was it property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, which would bring said property within the exception set out in the definition of a capital asset in Section 117, supra? (2) Was the agreement of March 21, 1941 between Martin and Pacific, a sale of the 22 acre tract on the installment plan thus constituting a sale of the property before the property had been held by Martin for a period of six months or more?

■ Since the Federal Revenue laws are designed to establish a national program of taxation, what is or is not "capital gain" income for the purpose of Federal taxation is not to be determined by the laws of the several states, but is determined by application of Federal law; Commissioner of Internal Revenue v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670; and the provisions of the Internal Revenue Act are not deemed subject to state law unless the language, or necessary implication of the applicable section requires the application of the laws of the states. United States v. Pelzer, 312 U.S. 399, 61 S.Ct. 659, 85 L.Ed. 913; Helvering v. Stuart, 317 U.S. 154, 63 S.Ct. 140, 87 L.Ed. 154; Putnam's Estate v. C. I. R., 324 U.S. 393, 65 S.Ct. 811, 89 L.Ed. 1023. Although state law creates legal interests and rights, substance and not form are controlling in applying the provisions of the Act. The realities of the taxpayers economic interest, rather than the name given to such interest by the taxpayer or by a state court's interpretation of the interest should control and determine the court's interpretation of what is taxable "capital gain" income. Commissioner of Internal Revenue v. Griffiths, 7 Cir., 103 F.2d 110, affirmed Griffiths v. Helvering, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Tinkoff v. Commissioner of Internal

Revenue, 7 Cir., 120 F.2d 564; Thompson v. Commissioner of Internal Revenue, 3 Cir., 205 F.2d 73. If it be found that an interest or right created by the state law comes within the sphere of intended taxation, the name applied to such interest or right counts for naught, and the Federal law must prevail to accomplish the purpose intended. Morgan v. C. I. R., 309 U.S. 78, 626, 60 S.Ct. 424, 84 L.Ed. 585. This is true whether the contentions of the Commissioner or those of the taxpayer are being considered.

■ No fixed, inflexible formula has been devised which, by mere application, will solve the question of whether property sold by a taxpayer was property held for sale in the usual course of trade or business, or was property held as an investment or capital asset. In the final analysis, each case must stand on, and be determined by the individual facts involved. Mauldin v. Commissioner of Internal Revenue, 10 Cir., 195 F.2d 714; Higgins v. C. I. R., 312 U.S. 212, 61 S.Ct. 475, 85 L.Ed. 783; United States v. Pyne, 313 U.S. 127, 61 S.Ct. 893, 85 L.Ed. 1231; Boomhower v. United States, D.C., 74 F.Supp. 997.

■ In determining whether a taxpayer is involved in a trade or business, courts have considered various factors to use as guideposts in arriving at a final determination. The emphasis has shifted from one to another of these factors at different times and in different cases. These factors include the continuity of sales, and sales related activity over an extended period of time; the efforts and activity of the seller in improving, advertising, and enhancing the marketability of the property; and the purpose or motive of the taxpayer in acquiring and selling the property. There appears to be a present emphasis on the extent of the taxpayer's activity in the transactions. Snell v. C. I. R., 5 Cir., 97 F.2d 891; Fahs v. Crawford, 5 Cir., 161 F.2d

315; Dunlap v. Oldham Lumber Co., 5 Cir., 178 F.2d 781; Austin v. United States, D.C., 116 F.Supp. 283; Boomhower v. United States, supra.

■ Considering then the transactions in the instant case as to their substance rather than their form and considering the taxpayer's true interest in the transactions under the contracts as shown by the provisions of the contracts and the parts actually played by the respective parties in the consummation of the contracts, it seems obvious that the taxpayer was not engaged in the business of sub-dividing and selling cemetery lots either as an individual or by way of partnership or joint venture. It follows that the income realized from the sale of property by him was capital gain and not ordinary income for the purpose of Federal taxation.

■ The commissioner's contention that the contract entered into by the taxpayer and Pacific on March 21, 1941 was a sale of the 22 acre tract of land within less than 6 months from the date of acquisition, thus making the income realized from such sale a "short term" capital gain subject to taxation as ordinary income, cannot be sustained. From a review of the written agreement and the business transactions completed pursuant thereto, it appears that no sale or sales were made or completed at the time of the agreement. The agreement provided for the future purchase of property by Pacific from the taxpayer upon conditions set out in the written contract of March 21, 1941. The sale of the individual lots was consummated only after the performance of the conditions prescribed by the covenants of the contract.

Judgment will be in favor of the plaintiff.

Order accordingly.