Stephen **W. JOHNSON** and **Eva Johnson,**
Plaintiffs,

v.

**UNITED STATES of America,**
Defendant.

No. 37720.

United States District Court
N. D. California, S. D.

Nov. 10, 1960.

Breed, Robinson & Stewart, Oakland,
Cal., for plaintiffs.

Laurence E. Dayton, U. S. Atty.,
Thomas E. Smail, Jr., Asst. U. S. Atty.,
San Francisco, Cal., for defendant.

ROCHE, District Judge.

Plaintiffs sue for the recovery of income taxes allegedly overpaid for the years 1952, 1953 and 1954, contending that profits from sales of real estate during said years were properly taxable as capital gains rather than ordinary income.

In February, 1929, taxpayers acquired a tract of land in Walnut Creek for the purpose of building a home to be used as a family dwelling for weekends and eventual retirement. In the years that

followed, taxpayers purchased additional tracts and used them for farming. In 1950, taxpayers decided to sell the property, reserving only a homestead for themselves. To this end they consulted a real estate broker, William F. Anderson, and together they formulated a plan to dispose of the property by first developing it as a subdivision. On October 1, 1950, taxpayers and Anderson executed a written "Agreement" whereby, in substance, the former agreed to convey to Anderson from time to time, dwelling sites of such size and at such prices as might be mutually agreed upon, to pay for and install all street work, sewers, water and gas necessary for the sites conveyed, and to lend to Anderson the funds necessary to construct dwellings on said sites in accordance with plans and specifications approved by taxpayers. The loans were to be secured by deeds of trust. In April, 1951, a supplemental agreement was entered into extending the terms of the original to include the remainder of the property. The agreements were subject to cancellation by either party upon thirty days' written notice.

Taxpayers and Anderson implemented their agreement as follows: Taxpayers deeded each of the six sites in the first subdivision to Anderson—receiving deeds of trust in return—and loaned Anderson funds to build houses upon the lots. Anderson held title while the houses were built. When a house and lot were sold, Johnson received the amount of his loan with interest, plus the "fair market value" of the site, a figure which was, in fact, determined by Johnson. Anderson kept whatever was left. The 26 lots in the second subdivision were handled differently. A lot was deeded to Anderson only when he found a builder who wished to buy and build upon it. In a single escrow transaction, Johnson deeded to Anderson, Anderson deeded to the builder, and the builder gave a deed of trust back to Johnson. After a house was built and sold, Johnson was paid and the deed of trust reconveyed. Occasionally, Johnson

made a loan to the ultimate purchaser. Anderson was compensated for his services by receiving the listing on each house and a $100 promotional fee. Anderson supervised the engineering and installation of streets, sewers, irrigation and the like, but all expenses were paid by Johnson.

■ Taxpayers contend that the entire property was sold to Anderson in one liquidating transaction evidenced by the "Agreement" of October 1, 1950 and the supplement which followed. But the court is unable to find in this "Agreement" any promise or obligation on the part of Anderson; moreover, the provisions for cancellation upon short notice and deferment of agreement on essential items attest to the illusory nature of the contract—a transparent attempt to avoid taxation. Clearly, the functions and risks of business enterprisers remained upon taxpayers.

Nor is there evidence that any of the subsequent transactions between the parties were, in substance, sales. No money ever passed from Anderson to taxpayers. Taxpayers' records do not show Anderson as the purchaser of any lot. Taxpayers waived interest and absorbed the deficit on the one lot from the first subdivision sold for a "paper" loss. The lots in the second subdivision—all but six of the total—were deeded to Anderson only after he had located buyers; passing the deeds through Anderson could not alter the substance of the transactions. In reality, they were direct sales from taxpayers to builders. It is the conclusion of the court that Anderson operated only as taxpayers' agent, a title he himself used on at least one occasion in correspondence.

■■ Therefore, the essential question is: Were taxpayers' activities in connection with the sale of said property properly characterized by the Commissioner of Internal Revenue as a "trade or business?" 26 U.S.C. (I.R.C.1939) § 117(a) (1) (A). The burden is upon taxpayers to show that they were not. It is well established that a person may engage in business by an agent, and the

activities of the agent for the benefit of his principal will be imputed to the principal. Achong v. Commissioner, 9 Cir., 1957, 246 F.2d 445; Kaltreider v. Commissioner, 3 Cir., 1958, 255 F.2d 833. Hence, in determining whether or not a trade or business existed, the activities of Anderson may be considered as the activities of the taxpayers themselves.

Plaintiff relies heavily—and almost exclusively—upon the decision of the Tax Court in Thrift v. Commissioner, 1950, 15 T.C. 366. Contrary to plaintiff's contention, that case is not controlling here, nor is it "on all fours" with the instant case. The crux of the decision is the finding that "petitioner improved and developed the property he had purchased and retained as an investment not with the intention of selling lots to the public or to building contractors generally, but solely for the purpose of facilitating the disposition of all or a large part of the property to a specific and limited group of builders with whom he had already reached an understanding." This court is unable to find an "understanding" of substance between taxpayers and Anderson when subdividing activities began or at any point thereafter. In Austin v. Commissioner, 9 Cir., 1959, 263 F.2d 460, 464, another decision cited by taxpayers, it was emphasized that "the record does not show a single activity on the part of the petitioners that they were holding their property for sale." Here, the sales efforts of Anderson have been imputed to taxpayers.

Taxpayers' records disclose the following: Prior to 1952, six lots were sold. These sales are not in issue here except as they help to indicate the size of the enterprise. In 1952 and 1953, 21 lots were sold, and one more in each of the years 1954, 1957 and 1958. In almost all cases, the lots were sold for prices ranging from $3,000 to $3,500. The number, frequency and size of sales during the tax periods in question, together with the costs, responsibilities and risks of development borne by taxpayers and the promotional activities—imputed to taxpayers—of their agent, constitute evidence sufficient to support the Commissioner's determination. Achong v. Commissioner, supra; Kaltreider v. Commissioner, supra.

Counsel for defendant may prepare and submit to the court proposed findings of fact and conclusions of law, consistent with the views herein expressed.